UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALBERT BESSON                                    CIVIL ACTION

VERSUS                                           NO: 09-6067

CRAIG WEBRE, ET AL.                              SECTION: R(4)


**ORDER AND REASONS**

In this action under 42 U.S.C. § 1983 and Louisiana law,
defendant Ronald Macomber seeks summary judgment on qualified
immunity grounds.[1]  Because there are genuine issues of material
fact as to whether Macomber violated clearly established rights
of which a reasonable officer would have known, the Court DENIES
Macomber's motion.


**I.    BACKGROUND**

This case arises out an incident that occurred during the
evening of September 4, 2008, shortly after Hurricane Gustav

_____
[1]    R. Doc. 19.

struck south Louisiana. That evening, plaintiff Albert Besson went to the Renovations Hardware Store in Cut Off, Louisiana.[2] Besson alleges that as he was leaving the store, he was approached by Lafourche Parish Sheriff Deputy Robert Macomber. Macomber told Besson, "I told you the store was closed." Besson alleges that Macomber grabbed him and dragged him to the parking lot, where Sheriff Deputies Montez, Chouest, Scott, and Macomber threw him to the asphalt and hit him with their feet, elbows, and fists. Besson also alleges that Macomber tased him three times. Besson was then arrested. Besson asserts that there was no probable cause for his arrest and that the Renovations Hardware store was open when Macomber stopped him. He further alleges that he did not resist the officers in any way.

On September 2, 2009, Besson filed a complaint in this matter.[3] Besson claims that the defendants used excessive force and unlawfully arrested him under color of state law in violation of 42 U.S.C. § 1983. Besson also claims that defendants assaulted and battered him in violation of Louisiana state law and committed other state law torts. Macomber now moves for summary judgment on qualified immunity grounds.

---

[2]    R. Doc. 1.

[3]    *Id.*

## II. STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l*

3

*Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith for and on Behalf of Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

## III. DISCUSSION

Macomber contends that Besson's claims against him fail as a matter of law because his actions were objectively reasonable

under the circumstances.  Macomber argues that he is entitled to
qualified immunity under federal law, as well as state law
immunity.

## A.  Federal Claims Under Section 1983

Qualified immunity protects government officials who perform
discretionary functions from civil liability unless their conduct
violates a clearly established federal statutory or
constitutional right of which a reasonable person would have
known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Felton v.
Polles*, 315 F.3d 470, 477 (5th Cir. 2002).  An official will face
liability only if (1) "the defendant's conduct violated a
constitutional right," and (2) "the defendant's conduct was
objectively unreasonable in light of clearly established law at
the time of the violation."  *Terry v. Hubert*, No. 09-30559, 2010
WL 2471834 at *2 (5th Cir. June 21, 2010), citing *Pearson v.
Callahan*, 129 S.Ct. 808, 816 (2009).  A court may begin by
addressing either aspect of the qualified immunity inquiry.
*Pearson*, 129 S.Ct. at 818.  The Fifth Circuit has stated:

> The inquiry into reasonableness asks whether the contours of
> the right are sufficiently clear that a reasonable official
> would understand that what he is doing violates the right.
> If reasonable public officials could differ as to whether
> the defendants' actions were lawful, the defendants are
> entitled to immunity.  Even if a defendant's conduct
> actually violates a plaintiff's constitutional rights, the
> defendant is entitled to qualified immunity if the conduct
> was objectively reasonable.

5

*Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 407-08 (5th Cir. 2007) (citations, quotation marks, and brackets omitted). Once an official raises a qualified immunity defense, the plaintiff has the burden of rebutting it. *Zarnow*, 500 F.3d at 407. To do so, the plaintiff may not rely on mere allegations, but "must produce competent summary judgment evidence raising a genuine issue of material fact." *Morales v. Boyd*, 304 Fed.Appx. 315, 318 (5th Cir. 2008). The qualified immunity determination should be made before trial as a matter of law unless disputed facts are material to resolving whether the official acted in an objectively reasonable manner. *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993). The Court will consider in turn Besson's federal constitutional claims for false arrest and excessive force.

1.   *False arrest*

Individuals possess a Fourth Amendment right to be free from false arrest. *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1305 (5th Cir. 1995); *Duckett v. City of Cedar Park*, 950 F.2d 272, 278 (5th Cir. 1992). The Fourth Amendment, however, "does not guarantee that only the guilty will be arrested." *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994), quoting *Baker v. McCollan*, 443 U.S. 137, 145 (1979). A warrantless arrest, such

6

as the plaintiff's arrest in this case, must be based on probable

cause. *United States v. Ho*, 94 F.3d 932, 935 (5th Cir. 1996).

Thus, to prevail on a false arrest claim under section 1983, the

plaintiff must prove that the defendants lacked probable cause to

arrest him. *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001);

*Sorenson v. Ferrie*, 134 F.3d 325, 330 (5th Cir. 1998).

The probable cause standard deals with the considerations

that cause reasonable people, not legal technicians, to act. *See*

*Maryland v. Pringle*, 124 S.Ct. 795, 799 (2003). Probable cause

exists for a warrantless arrest "when the totality of the facts

and circumstances within a police officer's knowledge at the

moment of the arrest are sufficient for a reasonable person to

conclude that the suspect had committed or was committing an

offense." *United States v. Cannon*, No. Crim. A. 03-119, 2003 WL

21406180, at *2 (E.D.La. 2003) (quoting *Ho*, 94 F.3d at 935-36).

Probable cause is an objective determination that does not depend

on the officer's subjective beliefs. *Ho*, 94 F.3d at 935.

Rather, it depends on the facts known to the officer at the time

of the arrest. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204

(5th Cir. 2009). Probable cause requires only a probability of

criminal activity, not proof beyond a reasonable doubt. *United*

*States v. Froman*, 355 F.3d 882, 889 (5th Cir. 2004).

Even if an officer erred in concluding that probable cause

7

existed for an arrest, he is entitled to qualified immunity if his decision was reasonable, albeit mistaken. *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993). Thus, if "a reasonable officer could have believed" that the arrest was lawfully based on probable cause, the officer retains qualified immunity. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In that event, the officer is entitled to summary judgment on qualified immunity grounds even if the officer violated an individual's Fourth Amendment rights. *Estep v. Dallas County, Texas*, 310 F.3d 353, 360 (5th Cir. 2002).

In this case, Besson was arrested and charged with three counts of public intimidation, one count of "remaining after being forbidden," and three counts of resisting an officer.[4] *See* La. R.S. § 14:63.3(A) ("No person shall without authority go into or upon or remain in . . . any structure, watercraft, or any other movable, or immovable property, which belongs to another . . . after having been forbidden to do so . . . by any owner, lessee, or custodian of the property or by any other authorized person."); La. R.S. § 14:122(A) ("Public intimidation is the use of violence, force, or threats upon any of the following persons, with the intent to influence his conduct in relation to his

---

[4]     R. Doc. 21, Ex. B, No. 4.

position, employment, or duty: (1) Public officer or public employee."); La. R.S. § 14:108(A) ("Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest . . ."). The State of Louisiana declined prosecution on the counts of public intimidation and remaining after being forbidden.[5] After trial on the merits, Besson was found not guilty of resisting arrest.[6]

"Claims for false arrest focus on the validity of the arrest, not on the validity of each individual charge made during the course of the arrest." *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001), citing *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995). Thus, if there was probable cause for any of the charges, then the arrest was properly supported by probable cause, and the false arrest claim fails. *Id.*

Macomber asserts that there was probable cause to believe that Besson was committing or had committed the offense of "remaining after being forbidden" because Besson entered Renovations Hardware after being forbidden to do so. Macomber

---

[5]     *Id.*

[6]     R. Doc. 21, Ex. C, Trial Transcript from *State of Louisiana v. Albert Besson*, No. 465449 (Jan. 29, 2010), pp. 119-122.

also contends that there was probable cause for the offenses of public intimidation and resisting arrest because of Besson's behavior in the context of a possible public disturbance.

*a.   Remaining After Being Forbidden*

Macomber gives the following account of the grounds for which he arrested Besson for remaining after being forbidden.  On the evening of September 4, 2008, Macomber was dispatched to the Renovations Hardware store in Cut Off, Louisiana.  Hurricane Gustav had just struck the area, and a curfew was in effect. Macomber had been dispatched to the same store the day before to assist with closing because customers were "[d]isturbing the peace" by attempting to buy supplies and gas as employees were trying to close the store.[7]  Macomber states that on September 4, he was again "dispatched to a disturbance" at Renovations after being advised that an employee of the store had called the Sheriff's Office.[8]  The complaint form filled out by the dispatcher states, "Brittany requesting assistance to close to disperse irate customers."[9]  "Brittany" refers to Brittany

---

[7]     R. Doc. 21, Ex. C, p. 9.

[8]     *Id.* at 8.

[9]     *Id.* at 24.

Sanamo, the manager of Renovations. Macomber concedes, and Ms.
Sanamo confirms, that the dispatcher was in error. Ms. Sanamo
asked the police to help her with closing the store "just in
case" any difficulties arose, as they had on previous nights, but
she did not indicate that there were any irate customers at that
time.[10]

Macomber contends that when he arrived at the store, an
individual he took to be an employee of Renovations told him that
the store was closing and that nobody else was allowed to
enter.[11] Macomber asserts that he then saw Besson in his car and
told him that he could not go into the store because it was
closed.[12] According to Macomber, Besson did not heed this
instruction, but instead drove his vehicle around another car,
went over a barricade, pulled into the parking lot, and went into
the store.[13] Although Macomber states that the store was closed
or closing at the time, he admits that he saw "lights and some
people in the store."[14]

---

[10]    R. Doc. 21, Ex. D, p. 4.

[11]    R. Doc. 21, Ex. C, p. 8.

[12]    *Id.*

[13]    *Id.*

[14]    *Id.* at 18.

Besson disputes Macomber's account in many respects.  Besson says that he went to Renovations to purchase electrical parts, not to purchase gasoline.[15]  When Besson arrived at the store, he pulled behind a car that had a piece of paper taped to its rear window stating "Last Car for Gas."[16]  Besson explains that he pulled behind the car and could not immediately bypass it because traffic was obstructed.[17]  Besson states that he rolled down his window and asked an officer, who was assisting with the flow of traffic, whether he could go around the car.  He contends that the officer allowed him around the car and informed him that the store would be closing at 7:30 p.m. and might already be closed.[18]  He denies that the officer told him that he could not go into the parking lot in order to enter the store.[19]  When traffic cleared, Besson says he made his way around the car toward the store and parked his car.[20]  Besson alleges that he saw an "open" sign on the door and people entering the store

---

[15]    R. Doc. 21, Ex. A, p. 4.

[16]    R. Doc. 21, Ex. B, No. 2.

[17]    R. Doc. 21, Ex. A, p. 4.

[18]    R. Doc. 21, Ex. B, No. 2.

[19]    R. Doc. 21, Ex. C, p. 101.

[20]    R. Doc. 21, Ex. A, p. 4-5.

ahead of him.[21]  He then entered the store, where a salesperson

assisted him.[22]  It was not until he exited the store, Besson

asserts, that Macomber confronted him.[23]

Additional witnesses support Besson's account that the store

was open when he entered it.  Brittany Sanamo, the manager of

Renovations, states that no one had given her any trouble that

evening, and that "by all means [Besson] was welcome in the

store."[24]  When she was asked whether the store was still open

when Besson went inside, Ms. Sanamo responded:  "Yes.  We had

people in the store. . . . We were making transactions while he

was in the store. . . . I never told [the officers] to stop

people from coming into the store."[25]  She further states, "There

was no problem with him coming in and getting something. . . . I

had not locked the doors yet."[26]  To Ms. Sanamo's knowledge, no

one had forbidden Besson from entering Renovations.[27]  She also

states that the parking lot was not barricaded, which conflicts

---

[21]    *Id.* at 5.

[22]    *Id.* at 6.

[23]    *Id.* at 8.

[24]    R. Doc. 21, Ex. D, p. 3.

[25]    *Id.* at 4-5.

[26]    *Id.* at 9.

[27]    *Id.* at 5.

with Macomber's account.[28] Warren Sanamo confirms that "the store was still open."[29] He says, "[w]e had people coming in and out. [Besson] had every right to come in the store like everyone else."[30] A witness named Mandy Plaisance also states that the store was open at the time of the incident.[31]

The Court finds that there is a genuine issue of material fact as to whether Macomber had probable cause to arrest Besson for remaining after being forbidden. Although Macomber's account suggests that there was probable cause to arrest Besson on this ground, Besson and the witnesses who support his account state that the store was open and that Besson had not been forbidden from entering it. These different accounts create material issues of fact as to whether there was probable cause for Macomber to arrest Besson on grounds of remaining after being forbidden. *See Sanchez v. Fraley*, No. 09-50821, 2010 WL 1752123 at *5 (5th Cir. April 30, 2010) (differing factual accounts preclude summary judgment).

---

[28]    R. Doc. 21, Ex. C, p. 54.

[29]    R. Doc. 21, Ex. E, p. 8.

[30]    *Id.*

[31]    R. Doc. 21, Ex. F, p. 2.

14

*b.    Public Intimidation and Resisting Arrest*

Macomber also contends that he had probable cause to arrest Besson for public intimidation and resisting arrest.  When Macomber arrived at the scene, he did not see a disturbance himself.[32]  Macomber asserts, however, that when he approached the front of the store and told Besson for a second time that the store was closed, Besson got "directly in [his] face" and replied that he "spent a lot of money in there."[33]  Macomber continues: "I told him several times to get back away from me.  He continued to come forward.  I put my hands up and pushed him back."[34] Macomber further states that Besson "proceeded to walk through" him—in other words, that Besson "pushed right through [his] shoulder."[35]  At that point, Macomber asserts that "another deputy grabbed [Besson] and the fight was on then."[36]  As Besson left the store, he was "swinging and moving around, trying to get away" from the officers who were "hanging onto him as he was

---

[32]    R. Doc. 21, Ex. C, p. 14.

[33]    *Id*. at 9.

[34]    *Id.*

[35]    *Id.*

[36]    *Id.*

carrying us to his vehicle."[37]  At that point, the fight

intensified.  Macomber states that Besson was

> swinging his arms, yelling and screaming.  When we were able
> to get him to the ground . . . his kicking became even more
> wild.  He kicked Deputy Shantell in the front part of her
> duty belt, which it carries a metal baton and which is
> basically very, very hard to break, and he kicked with such
> force he . . . broke off her baton and the holder that it
> came with.  Also, during that time my knee scraped up."[38]

Macomber and the other officers were eventually able to restrain

Besson and place him in handcuffs.[39]

Besson's account, once again, differs greatly from

Macomber's.  Besson asserts that as he exited the store, Macomber

stopped him and said in a threatening tone of voice, "I told you

the store was closed."[40]  Macomber then hit him in the chest.[41]

Besson backed into the store and said to the people around him,

"Do y'all see what's fixing to happen?"[42]  Besson says he put his

hands in the air in a "nonthreatening position" as Macomber

followed him into the store.[43]  At that point, Macomber grabbed

---

[37]    *Id.* at 21.

[38]    *Id.* at 10.

[39]    *Id.* at 11.

[40]    R. Doc. 21, Ex. A, p. 8.

[41]    R. Doc. 21, Ex. C, p. 103.

[42]    R. Doc. 21, Ex. A, p. 9.

[43]    *Id.*

him and twisted his shirt.[44]  Besson asserts that he did not

respond physically, but said only, "You need to take your hands

off me."[45]  As Besson and Macomber proceeded outside and were

surrounded by other deputies, Besson states that he tried to

convey that he did not know what was going on and that he was

innocent.[46]  The officers then took Besson to the ground.[47]

Besson testified that he did not and indeed could not resist at

that point because four officers were sitting on top of him.[48]

When asked in his deposition whether he resisted "at any point,"

Besson replied: "No, sir.  Not in my opinion.  I did everything

that was commanded of me."[49]  Besson concludes: "I never

disobeyed an order.  Every order he gave me, I complied. . . . I

did not resist in any way, shape, or form."[50]

Other witnesses support Besson's statement that he did not

threaten or resist Macomber.  Warren Sanamo states that after the

---

[44]    *Id.* at 10.

[45]    *Id.*

[46]    *Id.* at 12.

[47]    *Id.* at 12-13.

[48]    *Id.* at 13.

[49]    *Id.* at 12.

[50]    *Id.* at 15.

officer initially stopped Besson as he exited the store, the
officer "aggressively, with both hands, pushed Albert [Besson]
back away from him.  Albert at no time showed any signs of
aggression."[51]  Mandy Plaisance agrees, stating:

> "it was a rough approach. [The officer] was like pointing in
> his face.  They exchanged words.  This guy, he closed his
> fists and hit Albert in the chest.  Albert's arms went up,
> like – I am going to say like a crawfish.  Like, whoa, wait
> a minute here, you know, not to hit anybody, but open palms
> up."[52]

When asked whether she saw Besson "do anything to that officer
beforehand," Plaisance responded, "No.  Not at all.  That's what
was dumbfounding.  I didn't see [Besson] touch this guy."[53]
Plaisance states that when the officers took Besson down, he was
not kicking at all.[54]  Once Besson was on the ground: "[Besson]
was not kicking.  I thought, why is [the officer] on top of him?
This guy is not moving."[55]  Plaisance emphasizes: "His legs did
not leave the ground."[56]  Both Mr. Sanamo and Ms. Plaisance
assert that they did not see Besson resist the officers in any

---

[51]    R. Doc. 21, Ex. E, p. 3.

[52]    R. Doc. 21, Ex. F, p. 3.

[53]    *Id.* at 5-6.

[54]    *Id.* at 4.

[55]    *Id.*

[56]    *Id.* at 7.

way, attempt to flee, exhibit violence, refuse any commands, or physically or verbally threaten the officers that day.[57]

Besson denies that he resisted, threatened, or used any force or violence against Macomber or any other officer, and there are witnesses who support his account. Thus, there is a genuine issue of material fact as to whether Macomber had probable cause to arrest Besson for public intimidation and resisting arrest.

c.   *Qualified Immunity*

Whether a reasonable officer could have believed that Besson's arrest was based on probable cause under any of the stated grounds is also a genuine issue of material fact. The right to be free from false arrest was clearly established at the time of the incident. *See Jones v. City of Grand Prairie*, 209 F.3d 719 at *2 (5th Cir. 2000); *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975). The contours of that right, as they apply to this case, were not in any question. *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 207 (5th Cir. 2009) (the requirement that an officer know the factual predicate for probable cause prior to an arrest is "axiomatic"). Besson does not propose a "novel"

---

[57]   R. Doc. 21, Ex. E, p. 6-7, and Ex. F, p. 8.

interpretation or application of his constitutional rights, but
rather simply asserts that there was no probable cause for his
arrest. *See Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir.
2000) (qualified immunity protects officers against "novel"
theories of injury). Further, if Besson's account and the
statements of supporting witnesses are correct, then it would
have been objectively unreasonable for Macomber to believe that
there was probable cause for the arrest. *See Deville v.
Marcantel*, 567 F.3d 156, 166 (5th Cir. 2009) (denying qualified
immunity because the plaintiff submitted evidence that would
allow the jury to disbelieve the officer's evidence of probable
cause). Besson has alleged facts permitting an inference that
Macomber lacked "arguable probable cause." *Club Retro*, 568 F.3d
at 207 (stating qualified immunity standard for false arrest
claim). The Court therefore finds that Macomber is not entitled
to qualified immunity on the false arrest claim as a matter of
summary judgment.

*2.    Excessive Force*

Besson also asserts that Macomber and the other officers
used excessive force against him. The Fourth Amendment protects
citizens against the use of excessive force. To state an
excessive force claim, the plaintiff must establish that he

suffered "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006), citing *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004).  Further, the plaintiff must assert an injury that is more than *de minimis*. *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007).  In determining the reasonableness of an officer's use of force, the Court "must balance the amount of force used against the need for that force." *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996).  Some of the factors the Court considers are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009), quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The Supreme Court has emphasized that government officers are entitled to deference:

> The "reasonableness" of a particular use of force must be
> judged from the perspective of a reasonable officer on the
> scene, rather than with the 20/20 vision of hindsight. . . .
> The calculus of reasonableness must embody allowance for the
> fact that police officers are often forced to make
> split-second judgments-in circumstances that are tense,
> uncertain, and rapidly evolving-about the amount of force
> that is necessary in a particular situation.

*Graham*, 490 at 396-97.  The Supreme Court has also made clear

that an officer's actions are judged under an objective standard:

> An officer's evil intentions will not make a Fourth
> Amendment violation out of an objectively reasonable use of
> force; nor will an officer's good intentions make an
> objectively unreasonable use of force constitutional."

*Id.* at 397 (omitting citations).  An officer accused of using

excessive force is protected both by the reasonableness inquiry

as to the underlying constitutional claim and by qualified

immunity if his belief that he used an reasonable level of force

was mistaken but reasonable.  *Saucier v. Katz*, 533 U.S. 194, 206

(2001), *overturned in part on other grounds*, *Pearson v. Callahan*,

129 S.Ct. 808 (2009).

Besson has submitted evidence indicating that the amount of

force Macomber used was excessive in comparison to the need.  The

extent of the need for Macomber and the other officers to use

force is disputed.  As detailed above, Macomber contends that

Besson resisted arrest, but Besson asserts that he did not resist

the officers in any way.  Whether Besson resisted the officers is

a genuine issue of material fact.

Besson has also submitted evidence as to the amount of force

used against him.  Besson avers that after he retreated into the

store, Macomber "proceeded to pop [him] in the chest,"[58] grabbed

---

[58]     R. Doc. 21, Ex. C, p. 103.

him, and twisted his shirt.[59]  Warren Sanamo states that the

officer "aggresively, with both hands, pushed Albert [Besson]

back away from him.  Albert at no time showed any signs of

aggression."[60]  After Besson and Macomber went outside toward the

parking lot, Besson states that the officers beat him up:

> And there was a lot of – a lot of blows.  I don't know if
> they were fists, elbow, feet making contact with my body
> from my head down to my toes.  I was physically being pushed
> around, kicked around, elbowed."[61]

Mr. Sanamo stood in the doorway, which was no more than twenty

feet away from the incident.[62]  He states in his deposition that

the officers

> manhandled [Besson] to his truck. . . . The next thing I
> know is they start beating on him, throw him to the ground,
> tazer him two or three times.  Two of the officers was on
> his back.  One was punching him in the head while he was on
> the ground.[63]

Besson contends that Macomber told him, "I'm going to Tase you,"

and that he responded, "Why do you want to Tase me?"  Besson

asserts Macomber then tased him three times, which Besson says

---

[59]    R. Doc. 21, Ex. A, p. 10.

[60]    R. Doc. 21, Ex. E, p. 3.

[61]    R. Doc. 21, Ex. A, p. 12.

[62]    R. Doc. 21, Ex. E, p. 4.

[63]    *Id.*

was very painful.[64]

The witnesses at the scene saw Besson after the incident.
Ms. Plaisance asserts that when Besson stood up, she "could see
the bruise on his face."[65]  Ms. Sanamo states that when she saw
Besson in the back of the police car, "his nose was bleeding and
he was . . . roughed up."[66]  According to Mr. Sanamo, "the side
of [Besson's] face was pretty swollen, puffed up and red."[67]

There is a genuine issue of material fact as to whether
Macomber used excessive force in arresting Besson.  Besson has
presented evidence that the officers injured him even though he
offered no resistance and posed no threat to their safety.  *Cf.*
*Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009) (force
applied was constitutionally permissible when video evidence
showed the individual resisting arrest).  Further, Besson was
arrested for relatively minor crimes, as well as a misdemeanor.[68]
This factor suggests that there was no need for the officers to
use a great deal of force.  In addition, even if some use of

---

[64]    *Id.* at 13-14.

[65]    R. Doc. 21, Ex. F, p. 5.

[66]    R. Doc. 21, Ex. D, p. 6.

[67]    R. Doc. 21, Ex. E, p. 5.

[68]    *See supra* notes 36-38.

force was justified, the degree of force Macomber used under Besson's version of the facts was excessive. *See Deville*, 567 F.3d at 167-68 (amount of force used by officer was not justifiable). The evidence indicates that there is a genuine dispute as to whether Macomber's use of force was objectively reasonable under the circumstances.

There is also a genuine issue of material fact as to whether Macomber could have reasonably, though mistakenly, thought that his actions were reasonable for qualified immunity purposes. At the time of the incident, the plaintiff's right to not have excessive force used against him was clearly established. *See Tarver v. City of Edna*, 410 F.3d 745, 753-54 (5th Cir. 2005). Moreover, the contours of the right were sufficiently clear that a reasonable police officer would have understood that he could not gratuitously beat up or tase a suspect who was not threatening him or resisting arrest. *See Autin v. City of Baytown*, 174 Fed.Appx. 183, 186 (5th Cir. 2005) (tasing unthreatening suspect was objectively unreasonable); *Paternostro v. Crescent City Connection Police Dept.*, No. 00-2740, 2002 WL 34476319 at *16 (E.D.La. April 2, 2002) (objectively unreasonable to "break an individual's face to affect an arrest in the absence of resistance or a threat to the officer's safety" or to "gratuitously kick or punch a suspect once the officer

successfully thwarts the suspect's flight attempt"). Macomber emphasizes that the dispatcher told him there was a disturbance at Renovations, but he admits that he did not see a disturbance when he arrived at the scene.[69] An officer is not immunized for all of his subsequent actions simply because he is dispatched to the scene of a possible disturbance. The content of the dispatch may be relevant in determining the defendants' need to use force, but it is not dispositive under these circumstances. Besson has presented adequate evidence to create a material dispute of fact as to whether Macomber's actions were objectively unreasonable for both Fourth Amendment and qualified immunity purposes. Macomber is therefore not entitled to qualified immunity on summary judgment.

**B.    State Law Claims**

Macomber argues that he is immune from Besson's state law claims under La. R.S. § 9:2798.1. That statute immunizes state officials from suit based upon discretionary acts, but it does not apply "[t]o acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." La. R.S. § 9:2798.1(C)(2).

---

[69]    R. Doc. 21, Ex. C, p. 14.

Besson's assault and battery claim against Macomber alleges intentional misconduct. Therefore, Macomber is not immunized against Besson's state law claim under R.S. 9:2798.1.

## IV. CONCLUSION

For the reasons stated, Ronald Macomber's motion for summary judgment is DENIED.

New Orleans, Louisiana, this _3rd_ day of September, 2010.

_Sarah Vance_
_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE